You all are experienced. I don't need to give you any other rules. All right, we'll call up first. Mr. Scalia, you're up. Good morning. Chief Judge Stewart. May it please the Court. Eugene Scalia representing the appellants. I've reserved five minutes for rebuttal. Now keep your theater voice up. As I was saying, you know, we record these things and we don't remember so well, so we have to go back and listen to the tape and pick it up. I will aim not to be bashful, Your Honor. All right. The cases before this Court involve the most sweeping changes to the retail financial services sector since the 1940 enactment of the Investment Advisors Act. Practices in the market for IRAs are being radically transformed for both insurance agents and broker-dealers. This change is being made not by Congress, not by the Securities and Exchange Commission, and not by the states which regulate insurance. It's being done by an agency that lacks regulatory power over IRAs, broker-dealers, and insurance agents. And it's being done in a manner that repeatedly defies judgments made by Congress, converting a deregulatory authority into a means for instituting sweeping new requirements, including a private right of action that cannot be reconciled with Alexander v. Sandoval. These changes violate the Administrative Procedure Act. Indeed, they violate the First Amendment. These errors are broad, they are deep, they are integral to this package of rules, and the appropriate remedy is to vacate the fiduciary rule and the exemptions. If I could begin with the agency's interpretation of fiduciary, which is inconsistent both with the common law meaning of that term and the statutory text. The Department concedes in this case that there's a presumption when Congress uses common law terms that they retain their common law meaning in the statute. It also concedes, though, that in this case it has, quote, emphatically rejected the common law meaning associated with the term fiduciary. In fact, in this case it's as if Congress had used the word applesauce instead of fiduciary. The Labor Department would be interpreting the statute in exactly the same way, but that's not permissible. The Verity case teaches, for example, that what you do is look at the common law meaning of fiduciary when interpreting the tax code and then ask whether that understanding is consistent with the statutory text, and only if the text requires a different outcome do you then depart from the common law meaning. That circumstance is not present here, and yet the Department has adopted an interpretation of fiduciary that's flatly inconsistent with how it was understood at common law, where fiduciaries and salespeople were defined in opposition to one another. If you were a fiduciary, you could not be a salesperson to a plan, but in this case the Labor Department treats the fact that you sell to the plan as a mark that you are a fiduciary. It turns the understanding on its head. If I'm with Acme Insurance Company and I come to a prospective customer and I say, I'm with Acme, Acme has terrific products, and I'd like you to buy one. Under this rule, that makes me a fiduciary. That just can't be reconciled with the common law nor with the statutory text, which asks whether in that circumstance I've rendered investment advice for a fee. What was the motivation for this rule? I shouldn't ask such a dumb question, but was it to go after advice for IRAs or just generally to regulate the markets? Both, Your Honor. If I could make clear, the reason the Labor Department adopted this overbroad interpretation of fiduciary was exactly so it could go at IRAs and the markets. It said, and this is at appendix pages 323 and 327, it says the, quote, aim, quote, of this package of regulations is to get people into its so-called best interest standards. This agency, which is not our nation's retirement regulator, it is an employment agency, it reached certain judgments about the markets for IRAs, about broker-dealers, about annuities that are inconsistent with judgments reached by Congress, inconsistent with the views of state regulators, but it just thought that Congress and the states weren't doing their job well enough in an area that is outside the Labor Department's regulatory responsibilities. So how would this make it better? Along with Judge Jones, I'm sort of befuddled by why this whole hornet's nest was created. I mean, what's the bottom line? What does the Department of Labor want to do with this revision? Right now, salespeople of annuities and broker-dealers are subject to a suitability standard for annuities and a suitability standard that's somewhat comparable to the best interest standard for broker-dealers. The Labor Department thinks that's not enough. The Labor Department is used to regulating with fiduciary duties. It thinks everybody should have fiduciary duties, and it's willing to give a little bit, but it wants to impose radical new obligations throughout both of these industries because it thinks what the securities law is. If they could do that, then HHS could declare that the doctor-patient relationship is one of a fiduciary duty, right? It could, although it would have more grounds to do that than has been done here because at common law these sales relationships certainly weren't fiduciary. The Labor Department knew that it was stretching the word fiduciary beyond its proper bounds, and we know that for a couple of reasons. One is because when it adopted the rule, it repeatedly said sales and advice go hand-in-hand. They can't be disentangled. But when it came to large plans, the plans, by the way, that are their responsibility, employer-responsible ERISA plans, it said, well, actually, we're going to have a carve-out for sellers. It created this seller's carve-out where suddenly it found it could distinguish between sales. Let me – I tried to – I printed out the rule because all the briefs are a little vague about what the rule is. Am I mistaken? Does the rule take four or five pages in the Federal Register to try to define the distinction between recommendations and things that aren't covered by it? I think that's accurate. That's, I think, in the rule itself, but then the preamble to the rule even more. The explanation, yeah, I mean, because it goes into education and whether or not it's to a group of people and a whole bunch – too many factors for me to have absorbed preparatory to the sitting. And I just thought, you know, the old regulation was only a couple pages – two paragraphs and a couple pages of explanation, and now you're taking 10 pages to explain what a recommendation is or is not, right? That's correct. And two points about that, Judge Jones. One is – one thing that's crystal clear is that pure sales activity is treated as a covered recommendation. Again, a salesperson saying, I'm with Acme, we're a terrific company, we've got a great product, that makes you a fiduciary when you pick through all the different components of the recommendation definition. A one-time sale. Pardon? One-time sale, no relationship. That's correct. One-time transaction, they convert you to a fiduciary simply based on that sales transaction. And, again, they claim that you can't distinguish a sales from an advice relationship, but for the large plans that are actually in their area of regulatory responsibility, they created a seller's carve-out, and they did distinguish between offering sales and offering advice. The other way that we know they recognized their interpretation of fiduciary was overbroad was they created these massive exemptions. Now, let me be clear. The exemptive rules were the goal. They purposefully overdefined fiduciary so, as I think, Judge Jones, your question was getting at, they could then regulate markets that Congress gave to the SEC. But in adopting that overbroad definition, they said that it captured some relationships that were not properly regarded as fiduciary. They said that if they didn't tailor that interpretation with some other rule, it would have significant adverse consequences. Indeed, it would lead to abusive practices. So they knew their own interpretation was wrong. And in this sense and in others, this case resembles the Supreme Court's UARG or utility air case, where in there as well, the agency first overdefined air pollutant and then adopted what it called a tailoring rule to cut back at its overbroad interpretation. And the Supreme Court said the fact you needed that tailoring rule should have been a signal to the agency it had taken a wrong interpretive turn. Same thing here. Let me ask you a question. Yes, Judge. I may be slow. You said a straight sales would, in effect, be treated as a fiduciary. I'm trying to separate sort of overstatements to make a point. But I thought that even in the new definition or revised, it would take more than that. In other words, in a straight sale, I want to buy X. You know, I'll bring it to the register, whatever. I mean, it's just a transaction, you know, nothing stated. But I thought in reading even the revised rule would require more than that. It would take a recommendation or advice or some add-on. I'm not trying to define what the add-on is, but more than just the empty transaction. I guess in some, I thought about a sale. Okay, you know, here's the item. Here's the money. Straight sale. No advice, no recommendation, et cetera. So even in the amended rule, doesn't it still have that element? That's the one exception. All right, okay. If I came to you and said, sell me that, that's not covered. All right. But if I'm the salesperson, I come to you and I say, this is terrific, you should buy it, and then there's a sale, that is a covered transaction. In fact, if I come to you and I say, hey, I've got these three products, that is considered advice because I just put out a selective list of securities is the term they use in the rule. The fact that I've offered that selective list constitutes supposedly a recommendation, which puts us in a fiduciary relationship. The other way in which this case resembles UARG is this sliver of authority the Labor Department used to construct its immense new exemptive rule requirements because Judge Jones, as complex as their interpretation of fiduciary is, their best interest contract scheme is even more complicated and infinitely more burdensome than existing requirements. What they had was the authority to provide conditional exemptions. They have used that to do a number of things that are flatly inconsistent with congressional design. One is this creation of a private right of action. The Labor Department will tell you all they did was say there's got to be a contract, and lo and behold, it turns out those contracts can be sued on at state law. I went back. I found 81 times in the adopting release for the exemptive rule where they said the contract had to be enforceable or that enforceability was critical. In the rule itself, this is in the BIC exemptive rule, four different times they say the contract, not only must there be a contract, it must be an enforceable contract. They gave one reason only for having this enforceable contract requirement, in fact, for having a contract requirement at all. That was enforceability. The only reason given, it's a reason barred to them by Alexander v. Sandoval. In terms of the broader- Are you familiar with any case in the wake of Alexander where an agency has tried to really craft around Alexander by making something enforceable in state law? I'm not, Your Honor. That's very creative. Well, that is precisely the word the Assistant Secretary for ERISA used in describing what they'd done. She said they had to be creative to find a way to make these rights enforceable, and I grant you they were. We have not found another instance of this, but make no mistake, Alexander v. Sandoval is dead letter. If an agency that has permitting or licensing authority can proceed in this manner by saying, you can get your license or we'll give you an exemption, but you have to have contracts with your customers or others. Has anyone, and again, there's a lot in the briefs here, but did anyone parse 4975, the structure of 4975 and the way in which exemptions are allowed in the briefs? In particular, I was looking at 4975 creates C, identifies prohibited transactions. 4575D identifies over 20 exemptions from the prohibited transactions rule, and in particular, 4975F8 talks about what I would interpret loosely as flat fee advisory actions, which are exempt from the prohibited transactions if they have an eligible arrangement. This is 4975D17, where a plant fiduciary advisors may receive advice or engage in sales, and they may engage in fees, but if you parse through that, D17 refers to F8, which in turn refers to E1B, which includes IRAs, but all three subsections of D17 and F8B distinguish investment advice from sales. I confess that we had not briefed that. I don't know that it's been briefed, but that distinction is one that between sales and advice that is recognized at common law and also in the Advisors Act. Well, it's recognized in the statute that the Labor Department is allegedly interpreting. Thank you, Honor. Yet another statutory inconsistency, and if I could mention a third, and that is that when ERISA was enacted, there was Title I for employer plans, which had extensive fiduciary duties of loyalty, prudence, and the like, and extensive rights and remedies. That was Title I for employers. Title II did not have the fiduciary duties, did not have the enforceable cause of action, only had Treasury Department enforcement. So that was a very purposeful design by Congress. In fact, in the Mertens case, it only had Treasury Department enforcement for IRAs. It did not have a private right of action. So you had a great tower of requirements, really, for employer plans on IRAs, very minimal requirements. The Labor Department is displeased with that, and they've erected a tower of requirements for IRAs that is comparable and actually in certain ways exceeds what's on ERISA plans because, remember, they tried to bar class action waivers as well, which isn't even barred under ERISA. So that's obviously inconsistent with the statutory design, and the private right of action that they added, they didn't do it for ERISA plans because they looked and they said, oh, Congress already gave a private right of action in Title I, so we don't need to have a contract requirement. But Congress didn't do that in Title II, so we have to have a contract requirement so there is a private right of action. Obviously, they should have drawn the opposite inference, and I would point you to the Mertens case, which they rely on. On page 254, Mertens talks about what a carefully crafted and detailed statute ERISA is and how the court is loathe to infer new rights and remedies that would conflict with Congress's design. That's exactly how they've used their exemptive authority here. Another respect in which they've used their exemptive authority improperly here has to do with a particular product called the fixed indexed annuities. In the Dodd-Frank Act, Congress prohibited the SEC from regulating these products. The SEC had adopted a rule, it had been vacated by the D.C. Circuit, and Congress said don't do it again as long as these state standards are met. In comes the Labor Department and sits in judgment of those very state standards, decides they're inadequate. The Labor Department gave repeated emphasis to statements critical of state regulation and those products by the SEC, but Congress had just said to the SEC, stay out of here, the state regulation is enough. In other words, the Labor Department cared more about the criticisms by the SEC whose rule had been vacated and then legislatively prohibited than it did about the judgment that Congress had reached in the Harkin Amendment. And they erred in other ways as well when they sought to regulate these products. When an agency claims it's curing a harm, it needs to establish the presence of the harm. The D.C. Circuit said that in the national fuel gas supply case, and yet they failed to do that here. They never established that what they call conflicted relationships, which just involves receipt of a commission, was actually harming people who were buying these particular annuity products. Now, that goes to arbitrary and capricious, not to interpretation of the statute, right? That's correct. I think that the Harkin Amendment was a powerful indication by itself that they couldn't adopt the regulations of these products that Congress had just indicated were being regulated sufficiently by the states, but they went beyond flouting, I think, the clear congressional indication by relying on faulty evidence. The other error they made there had to do with mutual funds, where they really predicated this regulation on mutual funds. And just to comment on that briefly, again, this is not the Federal Retirement Insurance Agency. The Labor Department isn't even one of the agencies that's on the Financial Stability Oversight Council that was established by the Dodd-Frank Act. It is not a leading financial regulator. But it has told us that the securities disclosure requirements are no good. In fact, it indicated that it thought the securities laws were probably harmful because disclosure requirements harm people. They said that mutual funds are, you know, actively managed mutual funds are a major problem. They don't like proprietary insurance products. They don't like it that I can start a company, develop a product, and then go forth and offer it to people. They thought that's bad. This is not their area of responsibility. But time and again they made these mistaken judgments. So with mutual funds, they seized on certain characteristics of mutual funds and said that that justifies regulation here. But these annuity products don't share those characteristics. One, I'll just give one example. Others are in the briefs. But they said that when you have commission payments with mutual funds, it incentivizes sometimes active trading regularly in and out. Churning, we call it. Churning, exactly. But annuities are a buy-and-hold product. So that supposed flaw with mutual funds doesn't transfer over to annuities. They never grappled with that problem. So in this respect and others, their regulation of these particular products was flawed. And by the way, their judgment about the adequacy of the state insurance regulatory system, which was also integral to their conclusion, was one that Congress had implicitly rejected in the Harkin Act. And the SEC's own rule had been thrown out because it, too, had inaccurately appraised the state regulatory system. Does McCarran-Ferguson have any impact here? You know, Judge Jones-Kennedy, to me it looms in the background, and I tried. But I don't have a direct McCarran-Ferguson argument for you. But clearly what's being done here is inconsistent with the spirit of McCarran-Ferguson, which gave to the states responsibility over insurance. I would say that the Harkin Amendment reinforced that, and yet the Labor Department has stepped in and made itself, and there should be no mistaking about this, this is one of the most significant regulations in the financial services sector in decades. The Labor Department itself has said that this rule has significant consequences. That's on page 23 of its brief, which puts it squarely in that line of cases, including UARG, the Utilier case, Brown and Williamson, even King v. Burwell, where the Supreme Court has said, when there is an enormous regulatory change, we're going to hesitate and take a look and ask whether this is something that we think Congress intended the agency to regulate. Was there the implicit delegation that we look to under Chevron? And I would say here, plainly no, plainly Congress did not anticipate that the Labor Department would make itself the paramount regulator of insurance agents and broker-dealers when they're dealing with IRAs. I mentioned FIAs. The Labor Department erred with respect to variable annuities as well. It's a different type of annuity product that they also don't like. They like traditional fixed annuities, which are good for certain purposes but bad for others. That's why other products developed. Here again, they failed to establish the presence of harm. They also didn't acknowledge or address the harm that they were causing by regulating those products. The Supreme Court in Michigan v. EPA from just two terms ago said that when you're regulating, you need to consider the pros and cons, the costs and benefits. They purposefully, in their words, promoted access to traditional fixed-indexed annuities by putting them under a different rule exemption but purposefully put more restrictions on these other products because they didn't like them. If I could turn finally to the First Amendment, this Court need not reach the First Amendment argument if it decides this case on other grounds. However, I do want to emphasize if the Court were not to vacate these rules, if for some reason they were to be left in place with a remand, we think the criteria for vacating are clearly present here, but if the Court didn't vacate, then it would need to reach the First Amendment argument. And I would submit the other way in which the First Amendment argument is present and may be useful to the Court is simply as a matter of constitutional avoidance in interpreting their overbroad definition of fiduciary. What they have done is they've said, if I market my product to you, then I have thereby created a fiduciary relationship. The Supreme Court very recently in Sorrell said that speech in aid of pharmaceutical marketing is a form of expression protected by the free speech clause. And that's the Central Hudson case, after all. Proposing a commercial transaction, that is protected free speech. They have used that very protected free speech to put people into this very onus-vast regulatory apparatus, and then they've placed burdens on the ability to engage in that speech. So there's really no getting around that this is speech regulation. They may claim it doesn't ban speech, but Sorrell is clear as well that it's enough that the speech be burdened. The First Amendment is as concerned with burdens as with bans. So we believe that for all of these reasons, this Court should vacate. Unless there are further questions, I will reserve the remainder of my time for rebuttal. All right. Sir, you've reserved your rebuttal time. Thank you. Thank you. All right. We will hear from the Department, Mr. Sheehy. May it please the Court, Mike Sheehy for the United States. Are you going to keep your voice up? Will do, sir. So I want to start with— Representing the Department of Labor, not the United States, right? That's correct. So I want to start with the reason why the Department of Labor issued the fiduciary rule. Before the Department of Labor issued the fiduciary rule, retirement investment advisors were regulated under ERISA only if they gave advice for a fee on a regular basis and only where the advice was mutually understood to be the primary basis for investment decisions. As a result of those limitations on ERISA's protections, paid advice on certain retirement investments, including rollovers, which will total $2.4 trillion over five years, could be given even if not in investors' best interests and even if the advisor had a conflict of interest. The fiduciary rule addresses that issue by eliminating limitations on the Department's interpretation of ERISA's fiduciary definition. To bring such advice in such contexts within the scope of the statute's fiduciary duties— Let me—have you—well, all right. I'll give you a few minutes. The only point I wanted to make here is that that was a lawful and reasonable exercise of the Department's statutory authority in light of the record before the agency. To go to the primary source, I think, of the Court's concern, the other side makes a very strong argument that fiduciary in ERISA must be limited to their understanding of the common law. The problem is this case arises under the Chevron rubric, and under that rubric— How does it arise under Chevron? So the statute here defines fiduciary in an ambiguous manner. The ambiguity is— The brief never says the statute is ambiguous. Both your brief and the district court said only the statute does not unambiguously foreclose. Yeah, that's right, Your Honor, but the position— Well, if you really thought it was ambiguous, why didn't you say it was ambiguous? We did, Your Honor. The import of our statement is that there are multiple reasonable readings of the statutory language here. And I would remind the Court that the language here is not the word fiduciary shorn of other statutory text. The statutory language is fiduciary with an additional— But it is fiduciary according to verity. We look to the common law of fiduciary relations as well as the statute, and only if the statute requires deviation from the common law, which is the part that your brief never quoted, do we go beyond the common law. We agree that that's what verity said, Your Honor, in our brief. But you never quoted the last half of the sentence in your brief. Well, just take me at my word. One of the reply briefs points that out. I read your brief a while ago. Fair enough. Well, the argument here is that when we're assessing whether the common law is displaced, verity instructs that there are three inquiries. We look to see whether the common law is consistent with the text, with the structure, and most importantly, with the purpose. And we need to pay special attention to those three factors in the specific context of retirement investment plans. That's also in verity. Did you look at Section 4975D17? So I didn't look at it before oral argument because it wasn't raised by any of the parties at any point in the litigation. Well, it's certainly legitimate vis-a-vis construing the statute, and maybe I'm totally off base because all of you are much smarter and more prepared than I am, but I did note that D17 is an exemption to the prohibited transactions rule. It is an exemption based on fiduciary advice, but it says that such fiduciaries, and I'm making assumptions that this covers IRAs as well as plans, employer traditional plans, that they may receive consideration for either investment advice or sales transactions, and it distinguishes on multiple occasions between investment advice and sales. So doesn't that reflect some understanding that there are different things going on? Not necessarily, Your Honor. Again, I'd be happy to submit a letter brief to the court as to this question. If the other side thinks it's appropriate, again, maybe I'm totally off base. Of course. But to answer your question, Your Honor, that specific exemption you're talking about, D17, is a statutory exemption to the prohibited transaction provisions. I believe, and again, my understanding of it is just based on what I prepared for during the first part of the argument, that that is the portion of a statute called the Pension Protection Act from 2006  No, that's one subsection, but it was that. I didn't go into the statutory history, but computer programs is one paragraph of that lengthy subsection. I see. Well, so the fact also that the statute may distinguish at some point between advice and sales for the purposes of a narrow statutory exemption does not mean that when interpreting the term fiduciary, the department is unambiguously foreclosed from interpreting the statutory language in that manner. Let me ask you a couple questions about that. Sure. So you're saying that anybody who proposes one of these transactions that you're including is going to be eligible not only for damages under the ‑‑ if they go under a BIC contract, they're exposed to damages, right? If they don't go under the BIC contract, they're exposed to the excise tax. Okay. Let me give you a few examples that I'm concerned about. The case of Farm King versus Edward Jones came out. I assume you're prepared on that. I am, yes. And in that case, a couple of brokers from Edward Jones had come to the trustees of the Farm King plan and they sold them various securities, and when they went south, and eventually 99% of their plan was based on those recommendations, when a bunch of the investments went south they sued and the court says they are not investment advisors under that subsection 2, according to the previous regulation. That's right. How would that case come out under the new interpretation? I don't want to get in front of the agency here, and I'm not sure what the entire picture is, but it seems as if there would be a much better case that those advisors would be deemed fiduciary under the new definition of fiduciary. It seems to me that they would be, that you've upended that, and that involves sophisticated trustees. Let's say it involves less than $50 million in the pension plan because it clearly did, and you're talking about regular sales calls where the trustees could simply say yes or no to the various investments that were proposed. I want to tease apart two parts of that question, Your Honor, because I think this distinction is important. One part of their argument is whether or not the advice arises in a relationship of trust and confidence. A separate part of their argument is whether or not a salesperson can ever be a fiduciary. I think you're concerned, Your Honor, about that second portion with respect to this question. To speak directly to that, the Department of Labor has regulated sales relationships as fiduciary relationships even in 1975. That five-part test covered salespeople as well in the sense that even if you gave investment advice and then subsequently sold a particular customer a product, you could still be a fiduciary. I understand that, but the Seventh Circuit very clearly said in Farm King where you had this ongoing sales relationship over a period of several years that that was not a fiduciary relationship. Let me give you another example. Suppose I'm Joe Blow, the employee of a big company, and I call up the flunky in the Employment Benefits Department, and I have a 401K within the company pension plan. I say, gee whiz, there's a huge run-up in tech stock right now. You think I should put some money in there, put more of my money in that? And the flunky says, quote, everybody's doing it, close quote. Now the flunky is giving investment advice and for a fee, direct or indirect, because after all he's paid to be a flunky in the Benefits Department. Wouldn't he be a fiduciary under your rule? So I think there may be a provision of the understanding of recommendation that excludes advice in such circumstances from being covered here. But he is covered except that you're exempting him. Right. Third example, IRAs. What about people who are privileged enough to hold both IRAs and an investment portfolio? And they talk to their broker once or twice a year, and they say, well, we like such and such. What do you think? Blah, blah, blah. And then they decide indiscriminately I'm either going to buy bonds in my investment portfolio or I'm going to buy it in the IRA. So the broker is now in the position of giving advice for both the IRA, clearly allegedly covered by your rule,  but now he's covered by your rule completely, right? I'm not sure I followed all of that hypothetical, Your Honor. It's a broker who's recommending, who's talking to a client about either an IRA or a separate investment portfolio. Right. So only the IRA would be covered by the fiduciary. Where does your rule say that? So the rule just interprets that through ERISA. ERISA gives the Department of Labor authority to define what fiduciaries are. Practically speaking, I mean, even the big brokers, my understanding, is even the Morgan Stanleys and the Smith Barneys or whoever is in this business have decided to make everybody subject to these rules, right? Just about. That would be my understanding of certain actions that private companies have taken in response to the rule. But it's not, I think, accurate to suggest that those are mandated by the rule, maybe for certain corporate convenience. No, but the point is that whatever advice the person is giving pertains to both a regulated and an unregulated transaction. And the person giving advice on the penalty of BIC and fiduciary duty on one hand, or, well, I mean, obviously he has to go into BIC if he doesn't want to have an excise tax. No, Your Honor. So that's a very important point to make. The other side emphasizes that the BIC exemption operates like a mandate. That's simply not true. The agency in the record explains that contrary to plaintiff's assertions, nobody is forced to enter into the BIC exemption. It's important to remember how ERISA is structured. The first question is, are you a fiduciary? And if you are a fiduciary, then you're subject to the duties, right? So I think right now we're sort of blurring the distinction between the first question and the second question. As to the second question of once you are a fiduciary, what exactly is it that you need to do to satisfy your responsibilities, all you need to do is avoid engaging in prohibited transactions, namely to receive compensation in a conflicted manner. Or you could simply take advantage of one of the exemptions that the department has set forth, of which there are many. It's not just the BIC exemption. There are other exemptions, such as what's called PTE 8424, the robo-advice exemption that we were discussing earlier, and so on. So plaintiffs want to make it seem as if once you're a fiduciary, it's BIC exemption or bust. And that's simply not accurate, as the Department of Labor explained. Well, there's the exemption for $50 million. How many exemptions? Did you list all those exemptions in your brief? That is not an exemption, Your Honor. Carve out. Right. So that's the counterparty carve. Right. So that goes to the first question as to whether or not you can be a fiduciary in the first place. The Department of Labor reasonably determined that we don't need to regulate these individuals as fiduciaries to subject. I understand that. Go back to the, you say BIC exemption is not the universe of exemptions. How many exemptions are there? So there's that massive list of statutory exemptions, including D17, which you pointed out. There is also PTE 8424, which we discussed in the brief. Does your explanation of the rule harmonize with D17? Again, Your Honor, I don't want to make any flat-out statements here. I would want to read that provision in more detail, but I'd be more than happy to submit to you the Department's position as to that specific question down the line. Well, they should have stated it when they promulgated the rule, don't you think? Again, Your Honor, I would want to take a look at the provision to determine whether or not I agree with that position. That's true, and if they didn't state it, and I'm not going to say they didn't, because, again, I couldn't go through the several hundred pages of commentary, but if they didn't, you'd be taking a litigating position. It's assuming that D17 would foreclose the agency from doing what it did, and the agency did not, in fact, do that. I didn't say it would foreclose. I said it seemed to me to create some tension. All right. Again, Your Honor, I will submit a brief after-oral argument explaining that in detail. But to return to the question of what the Department of Labor can regulate as fiduciaries, I want to emphasize that if the Congress, in enacting ERISA, had decided simply to import the common law, it would have just used the word fiduciary. And to emphasize the point, that's not what happened here. Congress expressly adopted a functional test for fiduciary status. That functional test sweeps in broad language beyond what the common law permits, as the Supreme Court confirmed in Verity and in Mertens. And it was not unreasonable for the Department to look at the broad text, the broad structure of this provision, and the purpose of the provision, which is to protect the retirement savings of American workers and conclude. That is not the purpose of ERISA. ERISA Title I deals with employment plans, and every bit of the Title I is directed to plans. It is not directed to IRAs. Right. ERISA created IRAs, and ERISA also deals with plans. ERISA created IRAs to give the American people who weren't employed by big corporations or those with pension plans the opportunity to save on their own. Right. But it didn't create, it didn't say that the Department of Labor is labor. That's supposed to be employment relationships. So this is another misconception from plaintiff's brief that I'm glad for the opportunity to correct. Opposing counsel says that the Department has no regulatory authority over IRAs. That's simply not true. Title II of ERISA says the Department of Labor gets to determine who is a fiduciary with respect to transactions involving IRAs. It further says that the Department of Labor gets to interpret the prohibited transaction provisions with respect to IRAs. So since the Carter administration, the Department of Labor has been the sole interpreter of Title II's provisions with respect to IRAs and has, in fact, exercised that authority, including in response to this 2006 robo-advice exemption, which applies, as we discussed earlier, both to Title I plans and to IRAs. So it's not the case that the Department of Labor does not have any authority here. And that's what distinguishes this statute from the other cases that opposing counsel relies upon, such as UARG, King v. Burwell, and all of those. In those statutes, we did not have a broad grant of statutory authority to an agency that the agency has exercised for the better part of four decades consistently. In each of those other cases, we had an agency trying to capture elements of regulation that the agency had, for example, in the FDA v. Brown and Williamson case, actually disavowed and said, we don't have this authority. Well, I mean, wasn't the 1975 regulation something that essentially disavowed a broader interpretation of fiduciary? No, Your Honor. Investment advice. No, Your Honor. Why not? So the 1975 regulation was issued by the department in order to respond to the retirement investment market as it existed at that time. There's nothing in there that says the retirement market as it exists today. So that goes back to whether or not the statute is ambiguous. The statute just says you are a fiduciary if you, quote, render investment advice for a fee or other compensation direct or indirect. That's very capacious language, and it can reasonably be interpreted in the manner that plaintiffs suggest, and it could also reasonably be interpreted in the manner that the department has now interpreted it. One of their arguments is that if the statute were as capacious as you say, it would have said render any investment advice for a fee. So to begin with, that argument doesn't seem to track just how necessary it is for the court to say what investment advice does. Again, I'm just looking at D17 and F8 and so on, but if the statute consistently distinguishes investment advice from sales activity and if people have understood that distinction, I mean, intuitively you can understand that distinction and there are segments of the investment market that clearly operate on that distinction. Why isn't that the way the statute should be interpreted? Because, Your Honor, that's, as the department found, not how this market works. So according to the statements of plaintiffs themselves, this is on page 7337 of the record, these advisors aren't just selling products to people and giving advice gratis. What is being sold is the package of expert advice plus the investment product. And it's also important to understand that even salespeople continue to be regulated. So state suitability requirements, for example, attach not only to fiduciaries, but to people who at the common law would be considered, quote, mere salesmen. So the argument appears to be that in virtue of making sales you can't be a fiduciary, so you can be a fiduciary if all you do is give advice, but you can't be a fiduciary the moment money changes hands for it. That's simply inconsistent with what the department. Actually, Farm King is pretty derisive of the idea that the broker in that case, who I said had an ongoing and very close relationship with this company over a period of several years, was rather derisive. I mean, they did use the language of the previous regulation. And that's the decisive point. No, that is not the decisive point. I'm getting to what I think is a decisive point. They said this fellow was no different from a car salesman when you walk onto the floor and the car salesman is trying to find out what you're interested in in the car. And, you know, with respect, Your Honor, the Department of Labor looked at the record before the agency and determined that that's not how the market works today. Which market? The market for retirement investment advice to individual investors, which at the time Farm King How does the Department of Labor have any expertise whatsoever in the market for individual investor advice? Because the Department of Labor, as I said, since the Carter administration has been the sole regulatory body interpreting And how many regulations has it actually enacted with respect to IRAs? It's enacted several, Your Honor, including, I can't give a precise count, but to enumerate some. The first is the fiduciary definition in the 1975 regulation. The five-part test applies both to IRAs and to Title I. Plaintiffs have no problem with that regulation. They promulgated PTE 8424, the original version, in the late 1970s that, you know, then was codified in 1984. That also applied to IRAs. That was an exemption for people who were fiduciaries to IRAs. Plaintiffs don't have any problem with that provision. And most importantly, in 2006, Congress in this robo-advice statute vested the department with express authority to promulgate an implementation of a statutory exemption for fiduciaries to IRAs. So, again, I want to emphatically reject the proposition that the But that's three, and the upshot of each one of those is to have a very narrow ambit of fiduciary duties for salesmen to IRAs. The upshot of these provisions is to demonstrate... I mean, the DOL admits that now it's trying to transform what was a pretty lenient, to put it mildly, treatment of IRAs, vis-à-vis the prohibited transactions rule, into an architecture of regulation. That's the purpose. You said that's the purpose. The purpose of ERISA is to make sure that the retirement investment savings of American workers are safeguarded. Responsibility for that, in this precise circumstance of tax-preferred retirement investments, is arrogated not to the SEC, not to states, but by ERISA to the Department of Labor. In doing so, Congress understood that it was giving the Department of Labor tremendous authority over a tremendous sector of the investment market. And that's what distinguishes this case from Dodd-Frank, for example, or from the other security statutes that they rely upon. Those statutes relate to investments across the board, and they just set up some, as you say, disclosure requirements that are different from the substantial requirements placed upon specific investments in the ERISA context. Let's move over to these substantial requirements, and I would appreciate, and I'm sorry, I'm not going to take up the rest of your argument, but I would appreciate your addressing the cause of action. I will. The best answer to the cause of action point is that the department hasn't created a cause of action at all. So the point of Sandoval is to say, you cannot create a cause of action if you are not Congress. But if you have a contract, and the contract says, I am a fiduciary, and then the plaintiff, the investor, feels he's been shortchanged and goes into state court, that's a cause of action, is it not? It is not created by the department. So the cause of action is a preexisting state law breach of contract cause of action. Only if you have a contract that says, you are deliberately creating fiduciary duties and creating the mechanism to enforce the fiduciary duties. The only difference between Alexander is that it's in state court. No, Your Honor, there's a very significant difference. So an analogy, I think, makes the point. So just as people who are not Congress can't create causes of action, people who are not Congress can also not pass statutes. That's solely for Congress. Suppose an agency enters into a contract with another person and says, you can't discriminate on the basis of race or sex. That is enforceable in state law. And no one thinks that in creating such a provision, the agency has somehow enacted Title VII. So simply specifying the terms of what a contract must contain does not amount to the creation of a cause of action. Actually, there are some pretty serious arguments right now about the DO's Office of Civil Rights in position on sexual harassment standards under Title VII. But we'll leave that past. Right. We should, Your Honor. But to go back to the Sandoval point more generally, their point is that the Department of Labor somehow lacks authority to place certain conditions on exemptions. But these limitations appear nowhere in the statute. To be clear, the department has broad authority to promulgate exemptions. All it needs to do is find that the exemption and its conditions are, one, administratively feasible, two, in the best interests of investors, and three, protective of the rights of investors. The agency made that finding with respect to every single one of the exemptions that it issued in this case. And although plaintiffs tried to challenge one aspect of those findings in district court, they've abandoned that challenge here. So, in other words, nobody's disputing that the Department of Labor made the requisite statutory findings, and that's all the department needs to do in order to issue the conditions on the exemptions that it has. Before you run out of time, shift to the First Amendment. Yes. So the First Amendment is not implicated here, Your Honor, because what we have is not a restriction on speech. What we have is a restriction on the conduct of selling a particular thing. So, again, an example might make the point. Nobody thinks, for example, that it's somehow First Amendment implicating if Congress enacts a statute that says car dealers can't have conflicts of interest or must act in the best interest of their clients. So the happy fortuity that the product that plaintiffs are selling is speech does not convert what the department has done into a restriction on the First Amendment. If that were true, then a whole host of other statutes restricting the conduct by which investment advisors may conduct their business would be called into constitutional question. Those include, for example, state law suitability standards, which apply to retirement advice givers. Those would apply to federal security statutes, and they would also apply to ERISA itself. And the only response in the reply brief to this point is that somehow, you know, those statutes are okay because they arise in the context of a fiduciary relationship. Well, to begin with, that's not true. State suitability requirements attach with respect to the sale of any product that is regulated by the state. It doesn't require a preexisting fiduciary relationship. And more importantly, it's not clear why the existence of a fiduciary relationship should somehow remove a regulation from First Amendment scrutiny. Their position, essentially, is that if you give advice over the course of a relationship of trust and confidence, the First Amendment doesn't have any impact. But if you're just doing it over the course of a one-day, two-hour transaction, the First Amendment suddenly springs into effect. Then why isn't disclosure sufficient to regulate that activity as opposed to requiring a contract that says you're a fiduciary? So I would direct Your Honor to pages 747. I mean, I thought the weakest part of the district court's discussion, which you probably got from your brief, was that somehow this is regulating quote, misleading speech, because nobody, I mean, if an insurance agent said, I'm doing this all for free. Buy this product. First, only an idiot would believe that. But second, it would be directly misleading. So... So, again, Your Honor, you don't need to reach the question of whether there was misleading advice here. As to your specific question of whether disclosure is insufficient, I would point, Your Honor, to pages 747 through 749 in the Record on Appeal, which explains that the same gap in expertise that makes investment advice necessary also prevents investors from recognizing bad advice or understanding advisors' disclosures. But if I may make one final point as to the First Amendment question, Your Honor, that is that, you know, the test as to whether or not what the department did is tailored or not doesn't spring into effect unless you first conceive of this as a restriction on speech. And as the Supreme Court explained in Orlick and as I just have explained from this podium, this is not a restriction on speech, but rather is a restriction on the conduct of selling particular products. All right. Thank you. You have your argument. All right. For rebuttal, we'll move back to you, Mr. Scalia. In multiple ways, there is no precedent for what the Labor Department has done here. One of those ways is that there is simply no precedent interpreting ERISA for entirely ignoring the common law meaning and function of a fiduciary as has been done here. As I said before, it's as if the word applesauce were there. There is simply no precedent for entirely ignoring those common law roots as has been done here. Judge Jones, as you pointed out, the statute itself does speak separately of sales and advice. So does Congress in the Advisors Act and so did the Labor Department in this rule where it protested much of the time that sales and advice couldn't be distinguished. But when it came to the large plans that are actually its area of regulatory responsibility, it drew that very distinction. That was arbitrary and capricious. The government said a moment ago that the product they're selling is speech. Ponder that for a moment. The doorbell rings. A transaction occurs, and one spouse says to the other, What did you do? Well, an annuity was bought. Is that person going to say, I just bought some speech? No, they're going to say, I just bought an annuity. But that shows how they've converted the simple act of selling a product into purportedly giving advice every single time unless somebody comes to my door and just picks something off the shelf without me saying a word. Mr. Scalia, what was the, I just hadn't read it because it was just up on the bench, but what was the upshot of the 28-J you gave us on flyers' rights? Yes, and I apologize. That decision came down Friday. We didn't get it until the afternoon. That's why it was filed Friday. But that was a... No apology. But when you file it, it's actually the exception to the rule. Most of the time we get stuff up here as things that have been in the books a decade. So it's a rare moment that we get something that the ink really is still wet. But because it was up here, I just thought I'd ask you. I mean, we're going to read it, but it's, like everything else in this case, looks like it's about 30 pages. So I thought maybe you'd give me the cliff notes on... It relates to the annuities argument. And in that case, too, the agency relied on old data, and it made assertions without supporting data whatsoever, which is what happened here, Chief Judge Stewart. Okay. You heard the government say that under these rules, broker-dealers and insurance companies can, quote, simply take advantage of exemptions. Well, let me assure you, there is nothing simple about a regulatory package that by the department's own underestimated estimates will cost $30 billion. Judge Jones, in response to your question, there are six exemptive rules at issue, and it's not true that they're easily available. For example, 8424, one of the exemptive rules is preferentially made available to certain annuity products, but not others. What's the status? I mean, given this department revenue, what's the status of all affected currently as a rule just sort of in suspense until this litigation is over? It's currently in effect. It's currently in effect, Your Honor. You know, the industry is being rapidly changed as we speak, and the rest of the requirements come into effect in January. Was the request made in the district court to stay, though? Yes, and it was made here, too, Your Honor. But it does currently remain in effect. That's right. You also heard the government say that their exemptive authority gives them, quote, tremendous authority, quote, and is a, quote, broad grant of authority. Well, what a marvel is that? This is a regulation. This is a statutory provision that lets them reduce regulatory burdens, but they're right. They have treated it as a broad grant of tremendous authority and wielded it as a regulatory bludgeon in areas where they have no responsibility. And in that regard, Judge Jones, you asked about the Harkin Amendment. Let me also point out Section 913, also in Dodd-Frank, where, just as in the Harkin Amendment, Congress looked to the states to regulate annuities. With Section 913, they looked to the SEC to decide whether to change the standard for broker-dealers. But again, the Labor Department has waded into an area where Congress did not look for them to play that kind of a role. And finally, with respect to the cause of action, Mr. Sheen was unable to answer the point that if an agency can do this, Alexander v. Sandoval means nothing. And remember, not only did they require a contract, they very carefully and methodically determined such things as what damages should be available, where should litigation be brought, and whether class action should be available. They stepped far outside the role of an administrative agency. These errors are serious. The consequences are grave. And under well-established law, these rules should be vacated. Counsel Opposite said, well, at least since the 70s, I guess, in some time since, that there are aspects of this, not this, aspects of this issue where intuitively one says, well, Department of Labor, this is not, as you said, the financial regulatory agency. But his response to one question was, since the 70s, there had been other areas where DOL does regulate under risk, et cetera, et cetera. Now, I'm not missing your point in terms of what you argued, the potency of all that is here. But does that point you made in terms of this is sort of entirely springing up from nowhere as far as any regulatory authority, or is your argument that was qualitatively different from this or whatever? You follow me? Sort of my question. Yes, I do. And what I would say is it is true that as to IRAs, they have this exemptive authority. But what's entirely not true is that, as Mr. Shee said, they have, quote, exercised that authority consistently, quote, since the 1970s. They've used it in a fundamentally different way here than it was ever used before by, among other things, creating this private right of action, but also erecting a tower of requirements under Title II that is comparable to and in some ways even taller than the tower under Title I despite the Supreme Court statement in Mertens that this is a carefully crafted statute that's detailed and therefore they're loathe to infer the creation of new rights and remedies. So it was a radical departure, Chief Justice Stewart. All right. Thank you, sir. Hold on before everybody leaves. Yeah. If they think, yes. Yes, please. All right. Okay, without me restating it, you heard the colloquy between Judge Jones and counsel about the various subsections that Mr. Shee responded. I'd have flipped back through my notes, but you heard it like I did. So I want to say that we need more paper here, but in the interest of trying to get it right, whatever that is, I mean, y'all asked for what? 40,000 words? No. No, no, no, no. No, I'm being, I'm being facetious before I get to what he gets to do. They asked for 40,000 words and I knocked it down to something, 28, and then it came back. That was egregious. And then I think I upped it to 30 and then all the amicus wanted an individual brief alone and then I thought I had dealt with that and then that came back to a conventium and then there was more about, so I mean this has sort of been a pre-case on words. So that was the preface to me being hesitant to ask for other. But if you understand the definition of letter briefs, Mr. Sheehan, and counsel, on the points about, you know, those subsections, and I would dare say we want to get it right. I don't know that there's any other. Is there any other? I think that's pretty much the narrower point, not a reiteration of what's already been briefed, but to clarify on that point. Ong, you need. How many words? Well, I was trying not to be. Or three pages, I think that would do it. I was stating the worst nightmare so that I wouldn't have to say exactly how many. It's letter briefs. I was about to ask, well, let's just say no more than 10 pages, okay? Let's just. Oh, I don't think they need 10. Well, I don't think they do and I'm hoping, we got good lawyers still, you know. I just don't want to deal with another motion wanting an extension of four pages. Well, I may be completely wrong about it. Well, you can always use less. I mean, the court will always take less. But. Okay, how long you need? 10 days? A week? Two weeks? They can go back and read the statute. They're experts. A week? All right. I'm feeling benevolent. A week would be welcome. I'm feeling benevolent. You got 10 days. I do not want to deal with no. You can do it in less. I don't want to deal with no motions for extensions because it gave you seven and you want 10. You get 10, nothing else. No more. And I'm sorry to trouble you with these details, but is that 10 pages as in a brief or is that up 10 page a letter? Well, a letter brief. A letter, yeah. And finally, would you like the government to file first and have us respond to that or do you want simultaneous briefing? I always like simultaneous on this deal so we don't get the point counterpoint. That's what this case has been about. Let's do that. Just file them simultaneous. If we need more, we'll tell you and we know that you're willing. Thank you. But it's the spirit of the letter brief basically. We'll be looking at it all, but that'll be helpful on that narrow point. Is that agreeable? Yes. All right. You understand. Don't ask for anything different than what's been said because I'm telling you I'm not going to feel benevolent. Got it? And I understand you didn't mean 10 pages per party. Thank you, Your Honor. You absolutely did. All right. All right. Thank you, counsel, both sides. It's an important case and we get it and we'll give it the fidelity and attention to it and we'll try to get it handled the best we can. All right. That concludes. Thank you, sir. That concludes the orally argued cases this morning so those cases along with the NOAs will be submitted to the panel. Otherwise, the panel stands in recess until 9 a.m. tomorrow morning.